1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10

11 | JESSICA SCHROEDER, by and through her
guardian ad litem MARINA LANERI
12 | SCHROEDER,

CASE NO. 07cv1266-IEG(RBB)

13 |                                      Plaintiff,

Order Granting in Part and Denying in
Part Defendants' Motion for Summary
14 |      vs.

Adjudication [Doc. No.  84]; Denying
Plaintiff's Ex Parte Application for
15 | SAN DIEGO UNIFIED SCHOOL

Continuance [Doc. No. 101]

DISTRICT; THE BOARD OF EDUCATION
16 | OF THE SAN DIEGO UNIFIED SCHOOL
DISTRICT; KIMBERLY CHAMBERS,
17 | individually and in her official capacity as a
special education teacher for the San Diego
18 | Unified School District; MICHAEL
JIMENEZ, individually and in his official
19 | capacity as a vice-principal for the San Diego
Unified School District; and SUE SKINNER,
20 | individually and in her official capacity as a
school counselor for the San Diego Unified
21 | School District,

22 |                    Defendants.

23

24       Plaintiff Jessica Schroeder, by and through her parent and guardian Marina Laneri

25 Schroeder, has filed a complaint under 42 U.S.C. § 1983 against Defendants San Diego Unified

26 School District ("District"), the Board of Education of the San Diego Unified School District

27 ("Board), Kimberly Chambers, Michael Jiminez,, and Sue Skinner, alleging they violated her right

28 to due process under the Fourteenth Amendment.  Plaintiff also alleges a cause of action for

07cv1266

1    negligence against these Defendants.  Plaintiff's claims arise out of a peer tutor's sexual abuse of

2    Jessica in the Spring of 2006, while she was a student in Ms. Chambers ILS classroom at Serra

3    High School within the District.

4         All Defendants move for summary adjudication of Plaintiff's claim under § 1983, as well

5    as her claim for punitive damages.  Plaintiff has filed an opposition, and Defendants have filed a

6    reply.  Along with her opposition, Plaintiff also filed an ex parte application for a continuance

7    under Fed. R. Civ. Proc. 56(f), to allow her an opportunity to conduct limited discovery regarding

8    the District's receipt of federal funds for special education programs.  Defendant has filed an

9    opposition to that ex parte application.

10        Upon review of the materials, for the reasons explained herein, the Court GRANTS IN

11   PART AND DENIES IN PART Defendants' motion.  In addition, the Court DENIES Plaintiff's ex

12   parte application for a continuance of the summary adjudication motion.

13                                    ***Procedural History***

14        Plaintiff initially filed her complaint on July12, 2007, alleging causes of action against the

15   District and Ms. Chambers under 42 U.S.C. § 1983, Title II of the Americans with Disabilities

16   Act, the California Unruh Civil Rights Act, and California Civil Code § 51.9, as well as

17   negligence.  Plaintiff's mother, Marina Laneri Schroeder, asserted a claim for intentional infliction

18   of emotional distress against the District and Ms. Chambers.  Plaintiff also alleged a claim for

19   battery against Fernando Ortiz, the student who sexually abused her, and alleged Fernando's

20   parents, Henry and Sylvia Ortiz, were vicariously liable for their son's actions.

21        Defendants Fernando, Henry, and Sylvia Ortiz filed answers to the complaint on

22   September 14, 2007.  Defendants, the District and Ms. Chambers, moved to dismiss the complaint

23   for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). By order filed November 26, 2007,

24   the Court denied Defendants' motion.

25        On November 11, 2008, Plaintiff moved the Court for leave to file an amended complaint.

26   The Court granted that motion and on February 5, 2009, Plaintiff filed her amended complaint.

27   Plaintiff's amended complaint deleted all claims against Fernando, Henry, and Sylvia Ortiz, and

28   also deleted Marina Laneri Schroeder's individual claim.  Plaintiff added two new Defendants,

1   Michael Jimenez and Sue Skinner.  Plaintiff deleted all of her claims under the ADA and

2   California Civil Code, and alleged only claims under § 1983 as well as  negligence.

3       Defendants now move for summary adjudication of Plaintiff's claim under § 1983 and her

4   claim for punitive damages.

5                        ***Factual Background***[1]

6       At the time of the incident in the Spring of 2006, Jessica was an 18-year old severely

7   mentally retarded young woman with the functional ability of a young child.  [Amended

8   Complaint, ¶ 3; Deposition of Lauren Basteyns ("Basteyns Depo."), Exhibit A to Plaintiff's Notice

9   of Lodgment ("NOL") in Support of Response to Motion for Summary Adjudication, 21:5-11;

10  Deposition of Kimberly Chambers ("Chambers Depo."), Exhibit B to NOL, 16:24-17:23.]   Jessica

11  was a student in Kimberly Chambers' Integrated Life Skills ("ILS") class at Serra High School

12  within the District.  [Chambers Depo., 16:8-13.]  The purpose of this class is to teach students with

13  a low level of mental functioning certain basic skills, such as buying groceries and riding the bus,

14  so that they can function in society.  [Deposition of Michael Jimenez ("Jimenez Depo."), Exhibit F

15  to NOL, 19:8-17.]  Ms. Chambers, as the ILS teacher, was responsible for the personal safety

16  practices and procedures in that classroom.  [Chambers Depo. 99:22-100:1.]

17      Fernando Ortiz, who was also a student at Serra High School, was first assigned to be a

18  "peer tutor" in Ms. Chambers' classroom in the fall semester of 2005.  [Deposition of Susan

19  Skinner ("Skinner Depo."), Exhibit K to NOL, 50:21-51:7.]  Ortiz had been suspended right after

20  school began in the fall of 2005 for making derogatory statements on MySpace about a special

21  education student.[2]  [Id., 51:19-23; Jimenez Depo, 103:8-23.]  Upon his return to school, Ortiz

22  attended a conference with his mother, school counselor Sue Skinner and vice-principal Michael

23  _____

24      [1]Defendants, along with their reply, filed 11 pages containing more than 100 specific evidentiary objections to the Plaintiff's statements of fact and evidence in their opposition to the motion.  The Court will not rule on each of these objections individually.

25      Many of Defendants' objections, such as lack of foundation and lack of relevance, are not well taken because a proper foundation was laid at the time of the deposition.  However, on *numerous occasions* throughout the statement

26  of facts, Plaintiff's counsel argumentatively misstates testimony of the witnesses or cites portions of the record which do not support the statement of fact.  As a result, the Court relies in this order only upon those portions of Plaintiff's

27  statement of facts which are supported by the underlying record of admissible evidence.

28      [2]The boy about whom Ortiz made the purportedly derogatory statements was a "resource student," meaning he was a diploma bound student in regular classes who received some help in his classes.  [Skinner Depo., 57:5-8.]

1   Jimenez.  At that conference, Mr. Jimenez suggested Ortiz should serve as a peer tutor in the ILS

2   classroom so Ortiz would gain a greater understanding of how to help those who were not as

3   fortunate as him. [Skinner Depo., 53:1-57:15; Jimenez Depo., 104:3-105:12; Deposition of

4   Fernando Ortiz ("Ortiz Depo."), Exhibit J to NOL, 32:1-33:22.]  Everyone at the meeting agreed it

5   would be a good idea, so Ms. Skinner physically made the change to Ortiz's schedule, putting him

6   in the ILS classroom as a peer tutor during sixth period.  [Skinner Depo., 53:17-21, 57:20-58:2.]

7   Ortiz worked in the ILS room, where Plaintiff was a student, for only a week or two before he was

8   expelled for gambling at school.  [Ortiz Depo., 40:8-13; 50:7-16; 153:17-22; Skinner Depo.,

9   42:17-43:5.]

10      Ortiz returned to Serra High School for the spring semester of 2006.  Ortiz asked Ms.

11   Skinner if he would still be a peer tutor during sixth period, and she indicated it was necessary for

12   him to still be included in the peer tutor program.  Therefore, Ortiz again became a peer tutor in

13   the ILS classroom.  [Ortiz Depo., 157:3-20.]

14      Ortiz was in Ms. Chambers' room acting as a peer tutor on the afternoon of April 17, 2006.

15   [Chambers Depo., 100:12-13.]  Along with Ms. Chambers, there were four additional adults

16   present in the room, Carlos Long, Linde Forte, Sharon Webber, and Brenda Lucas.  [Chambers

17   Depo., 110:24-111:11.]  There was also another student peer tutor present, Stephanie.  [Chambers

18   Depo., 101:8-11.]  Close to the end of the school day, Stephanie approached Ms. Chambers and

19   told her she saw Ortiz in class that day with Jessica's hand on his "thighs and private parts" and

20   that she had seen it "a couple times."  [Chambers Depo., 107:10-24.]  Stephanie reported later that

21   she saw Ortiz and Jessica sitting at a table, and Jessica was trying to complete a puzzle.

22   [Declaration of Stephanie Legorreta ("Legorreta Decl."), Exhibit Q to NOL, ¶ 8.]  She saw Ortiz

23   unzip his pants, pull out his penis, and then reach over and take Jessica's hand and place it on his

24   penis.  [Id.]  Ortiz moved Jessica's hand up and down on his penis over a period of almost 30

25   minutes.  [Id.]  Ortiz does not deny he sexually abused Jessica.[3]  [Ortiz Depo., 106:2-

26   _____

27      [3]Ortiz disputes that the incident occurred on April 17. He recalls it occurred a couple weeks earlier, before
    Spring break, around April 3 or so, and he believes Stephanie did not report it until later.  [Ortiz Depo., 135:3-8.]  Ortiz

28   also states that there was a prior incident that may have been misinterpreted as abuse, where he had to scratch himself
    in his private area and Jessica mimicked the action. [Id., 124:7-20.] Plaintiff's counsel repeatedly throughout his
    opposition brief and in oral argument states that there were numerous instances of abuse. This argumentative assertion

107:22.]  Ortiz admits the abuse occurred while others were in the room engaging in a bowling activity, and that he had Jessica masturbate him a couple minutes at a time, off and on, over a period of about 30 minutes. [Ortiz Depo., 110:1-113:2.]  After Stephanie reported the incident to Ms. Chambers, Ms. Chambers reported the incident to Mr. Jimenez.  [Jimenez Depo., 125:25.]  Mr. Jimenez interviewed Stephanie the next morning, and then called the school police.  [Id., 126:7-15].  Ortiz was arrested and charged.

Prior to being chosen as a peer tutor, and in addition to his suspension related to the MySpace content, Ortiz had incurred a number of disciplinary infractions while a high school student[4] in the District.  During his ninth grade year, Ortiz was disciplined for cheating, "illegal activity," fighting, disturbing his class, making threats against another student and being argumentative.  [Declaration of Fernando Ortiz ("Ortiz Decl."), Exhibit P to NOL, ¶ 5; San Diego Unified School District Disciplinary Record Document Summary ("Disciplinary Record")[5], Exhibit R5 to NOL, entries 7-12.]  In the tenth grade, Ortiz was suspended on one occasion for sexually harassing two girls on a school bus[6] and on another occasion for having beer at school [Disciplinary Record, entries 13 and 14.] Ortiz was also later expelled from school for selling bottles of alcohol on the school campus, conduct for which he was arrested.  [Ortiz Depo., 24:7-19.]  Ortiz was later readmitted to school, however, because Serra High School did not have a representative attend the expulsion hearing.  [Id., 23:10-24:6.]  Ortiz was again suspended in the tenth grade for breaking into his teacher's computer and changing his grades. [Disciplinary Record, entries 15 and 16; Ortiz Depo., 150:14-17; Chambers Depo., 92:25-93:3.]  Ortiz was also

---

is not supported by the evidence submitted in opposition to Defendants' motion.

[4]Plaintiff also includes in her recitation of facts information about discipline Ortiz incurred in elementary and middle school. The Court considers those incidents too remote in time and irrelevant as there is no evidence that any of the Defendants would have had access to those disciplinary records at the time Ortiz was placed in the ILS classroom as a peer tutor.

[5]Defendants object to the Plaintiff's reliance on this document, arguing it is inadmissible hearsay. The summary document itself was prepared by Plaintiff's counsel prior to depositions. Attached to that document, however, are the underlying disciplinary reports.  The Court assumes Plaintiff can lay a proper foundation establishing this document's admissibility under Fed. R. Evid. 1006, and the underlying documents are admissible under the business records exception.

[6]Ortiz denies harassing the girls.  [Ortiz Depo., 149:7-150:1.]

07cv1266

1  suspended a couple of times his junior year for fighting at school and for stealing chemicals from

2  the chemistry lab. [Ortiz Depo., 150:24-151:4.]

3        At his deposition, Ortiz testified that he received little training regarding how to work with

4  Jessica in the ILS classroom.  [Ortiz Depo 55:2-56:4.]  Ortiz and the other peer tutors were "quite

5  often" left alone in the ILS classroom with Jessica and other special needs students without any

6  adult in the room. [Ortiz Depo. 57:4-23; 58:8-9.]  On at least two occasions, Ortiz was left alone in

7  the classroom with Jessica and another ILS student with no one else present.  [Ortiz Depo. 58:20-

8  25.]  Ortiz testified Ms. Chambers provided very little supervision to him throughout the Spring

9  semester. [Ortiz Depo. 60:8-61:2; 70:10-15.]  For example, Ortiz frequently left the classroom

10 with another ILS student, Kyle, during which time he would go smoke marijuana on school

11 grounds.  [Ortiz Depo. 67:20-68:9.]

12       At the time school officials made the decision to place Ortiz in the ILS classroom as

13 discipline for his derogatory MySpace comments, Mr. Jimenez was "familiar with what [Ortiz]

14 had done at Serra High School in terms of getting involved in inappropriate behavior."  [Jimenez

15 Depo. 107:5-7.]  Mr. Jimenez was not aware Ortiz had a prior incident of sexual harassment while

16 at Serra High School.  [Id. 108:1-12.]  Mr. Jimenez had access to Ortiz's entire disciplinary history

17 with the District through his computer, but did not look at that information before he decided to

18 place Ortiz in the ILS classroom.  [Id. 106:20-22,108:6-111:19.]

19       At the time she participated in the decision to place Ortiz in the ILS classroom as a peer

20 tutor, and when she made the change to Ortiz's schedule, Ms. Skinner did not know of Ortiz's

21 prior incident of sexual harassment while at Serra High School, or much of anything about Ortiz's

22 disciplinary history. [Skinner Depo., 54:13-16.]  Ms. Skinner had access to the school district's

23 computer system containing disciplinary records.  [Id. 14:14-15:13.]  Through that system she

24 could query regarding a student's disciplinary history for the current year, but she would have to

25 request someone else obtain information regarding prior years.  [Id.]  Ms. Skinner did not do any

26 investigation regarding Ortiz's disciplinary background prior to changing Ortiz's schedule to put

27 him in the ILS classroom, or prior to placing him back in the classroom when he returned from

28 suspension at the beginning of the spring semester. [Id. 55:5-8.]

Ms. Chambers was in charge of the peer tutor program in the ILS classroom in the spring semester of 2006. [Skinner Depo. 40:21-25.]  As the ILS teacher, Ms. Chambers had an opportunity to veto the decision to place Ortiz in her classroom as a peer tutor or request a check of his disciplinary history.  [Skinner Depo. 55:19-56:3.]  At the time Ortiz was assigned to Ms. Chambers' ILS classroom as a peer tutor, Ms. Chambers did not know anything about his disciplinary history except that he was returning to school after having been suspended. [Chambers Depo. 73:6-75:4; 84:11-85:15.]  At the time of her deposition, Ms. Chambers was shocked to learn of Ortiz's disciplinary history.  Ms. Chambers believed it would have been helpful if she had the information when Ortiz began working in her classroom.  [Chambers Depo. 85:13-25; 95:9-96:14.]

### *Ex Parte Application for Continuance*

As an initial matter, Plaintiff's counsel requests a continuance of the summary adjudication motion under Fed. R. Civ. Proc. 56(f) to allow him to conduct additional discovery regarding the District's receipt of federal funds for special education. In particular, in his opposition to the Defendants' motion, Plaintiff implies the District's receipt of federal special education funding could act as a waiver of Eleventh Amendment immunity.  Plaintiff argues the Defendants failed to raise the immunity defense in their answer, such that when they did assert it in the summary adjudication motion, he was unable to conduct discovery in a timely manner to address the immunity issue.

As explained in detail below in the discussion of Defendants' Eleventh Amendment immunity, Plaintiff in this case has not alleged any cause of action under any federal statute which conditions the receipt of federal special education funds upon a waiver of the state agency's sovereign immunity. Thus, as a matter of law as explained below, regardless of whether the District received federal funds under the IDEA (the particular statute the Plaintiff identifies in his application), receipt of such funds would not act as a waiver of  the Defendants' immunity in this case.  Therefore, the Court DENIES Plaintiff's ex parte application to continue this motion to permit additional discovery.

1                      ***Summary Adjudication Standard***

2      Pursuant to Fed. R. Civ. Proc. 56(a), a party may move for summary adjudication on less

3 than all of the claims in the case.  Summary judgment is appropriate on a particular claim where

4 the pleadings and other evidence show "that there is no genuine issue as to any material fact and

5 that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c); <u>Celotex Corp.</u>

6 <u>v. Catrett</u>, 477 U.S. 317, 322 (1986).  A material issue of fact is a question the trier of fact must

7 answer to determine the rights of the parties under the applicable substantive law.  <u>Anderson v.</u>

8 <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

9      A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

10 for the nonmoving party."  <u>Id.</u> at 248.  Summary judgment may be granted in favor of a defendant

11 on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district

12 court that there is an absence of evidence to support the nonmoving party's case."  <u>Celotex</u>, 477

13 U.S. at 325; <u>see</u> <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

14      The moving party bears "the initial responsibility of informing the district court of the basis

15 for its motion."  <u>Celotex</u>, 477 U.S. at 323.  To satisfy this burden, the moving party must

16 demonstrate that no genuine issue of material fact exists for trial.  <u>Id.</u> at 322.  However, the

17 moving party is not required to negate those portions of the non-moving party's claim on which

18 the non-moving party bears the burden of proof.  <u>Id.</u> at 323.  To withstand a motion for summary

19 judgment, the non-movant must then show that there are genuine factual issues which can only be

20 resolved by the trier of fact.  <u>Reese v. Jefferson Sch. Dist. No. 14J</u>, 208 F.3d 736, 738 (9th Cir.

21 2000) (citing Fed. R. Civ. P. 56; <u>Celotex</u>, 477 U.S. at 323).

22      The nonmoving party may not rely on the pleadings but must present specific facts creating

23 a genuine issue of material fact.  <u>Nissan Fire</u>, 210 F.3d at 1103.  The inferences to be drawn from

24 the facts must be viewed in a light most favorable to the party opposing the motion, but conclusory

25 allegations as to ultimate facts are not adequate to defeat summary judgment.  <u>Gibson v. County of</u>

26 <u>Washoe, Nev.</u>, 290 F.3d 1175, 1180 (9th Cir. 2002).  The Court is not required "to scour the record

27 in search of a genuine issue of triable fact," <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279 (9th Cir. 1996),

28 but rather "may limit its review to the documents submitted for purposes of summary judgment

1   and those parts of the record specifically referenced therein." <u>Carmen v. San Francisco Unified</u>

2   <u>Sch. Dist.</u>, 237 F.3d 1026, 1030 (9th Cir. 2001).

3                                          ***Discussion***

4         Defendants seek summary adjudication of Plaintiff's cause of action under 42

5   U.S.C.§ 1983 as well as Plaintiff's claim for punitive damages.  Defendants argue (1) the District,

6   Board, and individuals to the extent they are sued in their official capacities, are immune from

7   liability under the Eleventh Amendment; (2) Plaintiff cannot show Defendants violated her

8   constitutional rights; and (3) Plaintiff's claim for punitive damages fails as a matter of law.

9   *1.*       *Eleventh Amendment Immunity*

10        Broadly speaking, the Eleventh Amendment to the United States Constitution bars suits for

11  damages in federal court against a non-consenting State.  <u>Kimel v. Florida Board of Regents</u>, 528

12  U.S. 62, 73 (2000).  This immunity applies both to the state itself and to its agencies.  <u>Belanger v.</u>

13  <u>Madera Unified School Dist.</u>, 963 F.2d 248, 250 (9th Cir. 1992). The determination of whether a

14  particular public entity is entitled "'to be treated as an arm of the State partaking of the State's

15  Eleventh Amendment immunity, or is instead to be treated as ... [an]other political subdivision to

16  which the Eleventh Amendment does not extend'" turns upon a number of factors.  <u>Beentjes v.</u>

17  <u>Placer County Air Pollution Control Dist.</u>, 397 F.3d 775, 777-78 (9th Cir. 2005) (quoting <u>Mt.</u>

18  <u>Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 280 (1977).  The following five

19  factors are considered in the Ninth Circuit to determine whether an entity is an arm of the state:

20       (1) whether a money judgment would be satisfied out of state funds, (2) whether the
21       entity performs central governmental functions, (3) whether the entity may sue or
         be sued, (4) whether the entity has the power to take property in its own name or
22       only the name of the state, and (5) the corporate status of the entity.

23  <u>Beentjes</u>, 397 F.3d at 778 (quoting <u>Belanger</u>, 963 F.2d at 250-51.

24        After considering the above five factors, the Ninth Circuit has explicitly held that school

25  districts and school officials sued in their official capacity within the state of California are

26  immune from suit under the Eleventh Amendment.  <u>Belanger</u>, 963 F.2d at 254; <u>Cole v. Oroville</u>

    <u>Union High School Dist.</u>, 228 F.3d 1092, 1100 n.4 (9th Cir. 2000); <u>Stoner v. Santa Clara County</u>
27
    <u>Office of Education</u>, 502 F.3d 1116, 1122 (9th Cir. 2007) (declining to revisit <u>Belanger</u>'s holding
28
    that a school district is a state agency for Eleventh Amendment purposes in light of subsequent

07cv1266

1    Supreme Court authority).  As a result, absent a waiver, Defendants San Diego Unified School

2    District, San Diego Unified Board of Education, and Defendants Kimberly Chambers, Michael

3    Jimenez, and Sue Skinner are immune from liability for damages insofar as they are sued in their

4    official capacities.

5            Plaintiff argues Defendants have waived their immunity by (a) failing to timely assert it in

6    this action and instead engaging in extensive litigation, and (b) accepting federal funds for special

7    education programs. Both of these arguments fail.

8            a.        Failure to timely assert immunity

9            Plaintiff argues Defendants waived their immunity under the Eleventh Amendment by

10   failing to assert this defense in its answer and thereafter engaging in extensive litigation on the

11   merits of the case.  "A waiver of Eleventh Amendment immunity must unequivocally evidence the

12   state's intention to subject itself to the jurisdiction of the federal court."  Hill v. Blind Industries

13   and Services, 179 F.3d 754, 758 (9th Cir. 1999).  Although a waiver must be unambiguous, there is

14   no requirement the waiver be express or written.  Id.  "[A] state may waive its Eleventh

15   Amendment immunity by conduct that is incompatible with an intent to preserve that immunity."

16   Id. Eleventh Amendment immunity is more appropriately considered an affirmative defense, rather

17   than a jurisdictional bar, and the burden is upon the party invoking the immunity to assert and

18   prove those matters necessary to establish the defense.  Douglas v. California Dept. of Youth

19   Authority, 271 F.3d 812, 821 (9th Cir. 2001); ITSI T.V. Productions, Inc. v. Agricultural Assn., 3

20   F.3d 1289, 1291 (9th Cir. 1991).[7]

21          For example, in Hill, the state agency appeared, actively litigated the case on its merits, and

22   waited until the opening day of trial to first assert immunity under the Eleventh Amendment.  The

23   court held the agency waived its immunity, noting "[t]he Eleventh Amendment was never intended

24   to allow a state to appear in federal court and actively litigate the case on the merits, and only later

25   belatedly assert its immunity from suit in order to avoid an adverse result."  Similarly, in Douglas,

26   271 F.3d at 821, the state agency did not raise the Eleventh Amendment defense before the district

27

28          [7]Plaintiff cites ITSI TV Productions, Inc. for the proposition the Eleventh Amendment immunity is waived if
     not asserted as an affirmative defense in a defendant's answer.  Neither that case, nor any of other cases cited by
     Plaintiff, impose such a standard for determining whether a party has waived its Eleventh Amendment immunity.

1   court, nor did it raise the defense in its opening appellate brief.  The Ninth Circuit refused to allow

2   the agency to assert the defense for the first time on appeal, instead remanding to the district court

3   to determine based upon the factual record whether the agency waived its immunity.

4          In its answer to Plaintiff's original complaint in this case, the District asserted as its third

5   affirmative defense that "it is entitled to statutory immunity from liability." In addition, Ms.

6   Chambers asserted that she was "entitled to absolute and discretionary immunity because she is,

7   and at all pertinent times was, a public entity employee."  The District and Ms. Chambers again

8   asserted these affirmative defenses in Defendants' answer to the amended complaint, which

9   counsel filed on March 2, 2009.  [Answer to amended complaint, ¶ 81.]  The Board, Mr. Jimenez,

10  and Ms. Skinner, who were added to the case with Plaintiff's filing of the amended complaint on

11  February 5, 2009, did not assert any immunity from liability in the answer. However, counsel filed

12  this motion four days later on March 6, 2009.

13         The Ninth Circuit has stressed that "a state does not waive Eleventh Amendment immunity

14  merely by defending in federal court. Instead, waiver turns on the state's failure to raise immunity

15  during the litigation." Demshki v. Monteith, 255 F.3d 986, 989 (9th Cir. 2001).  In this case, the

16  District and Ms. Chambers asserted immunity from suit in their answer. The Board and remaining

17  individual Defendants asserted the defense in the current motion, which counsel filed four days

18  after filing their answer to the amended complaint, and prior to the time when all discovery was

19  ordered to be completed.[8]  The Defendants' conduct has not been "incompatible with an intent to

20  preserve that immunity."  Hill, 179 F.3d at 758.

21         b.      Acceptance of federal special education funds

22         Alternatively, Plaintiff argues the District and its employees waived Eleventh Amendment

23  immunity by accepting federal funds under the IDEA pertaining to special education student

24  instruction.  "Congress may abrogate the States' constitutionally secured immunity from suit in

25  federal court only by making its intention unmistakably clear in the language of the statute."

26  Kimel, 528 U.S. at 73. Where authorized under a valid grant of constitutional authority, Congress

27

28         [8]Upon joint request by the parties, Magistrate Judge Brooks extended the discovery cut-off from February 12, 2009 to March 16, 2009.

may condition a state's acceptance of federal funds upon the state's waiver of Eleventh

Amendment immunity to suit.  Board of Trustees v. Garrett, 531 U.S. 356, 363-64 (2001).

Congress's abrogation of the States' Eleventh Amendment immunity must be unequivocal.  Id.

Congress has unequivocally, and under a valid grant of constitutional authority, subjected

states to suit in federal court under the Rehabilitation Act if they accept federal Rehabilitation Act

funds.  Douglas, 271 F.3d at 819.  Similarly, Congress has unequivocally abrogated a state's

sovereign immunity for claims brought under the Individuals with Disabilities in Education Act

("IDEA") where the state has accepted federal funds for IDEA programs.  Board of Education v.

Schutz, 290 F.3d 476, 480 (2d Cir. 2002).  Nothing within either of those Acts, however, abrogates

a state's immunity with regard to actions brought under 42 U.S.C. § 1983.  See 20 U.S.C.

§ 1403(a) ("[a] State shall not be immune under the 11th amendment to the Constitution of the

United States from suit in Federal court *for a violation of this chapter*"); 42 U.S.C. § 2000d-7 ("[a]

State shall not be immune under the Eleventh Amendment of the Constitution of the United States

from suit in Federal court for a violation [of this Act]."

Plaintiff cites two cases in support of her argument that the District's acceptance of funds

under the IDEA waived its Eleventh Amendment immunity to suit under § 1983, M.A. v. State

Operated School District, 344 F.3d 335, 344-45, fn.9 (3d Cir. 2003) and J.R. v. Waterbury Board

of Education, 272 F. Supp. 2d 174 (D. Conn. 2001).  Neither of these cases, however, are

controlling or persuasive.  The IDEA provides a private cause of action only for prospective relief

in the form of a free and appropriate public education.  Mark H. v. Lemahieu, 513 F.3d 922, 930

(9th Cir. 2008).  As a result, any action for damages for violation of the IDEA must be brought

under another statutory provision, such as the Rehabilitation Act or 42 U.S.C. § 1983.  Id. at 930.

In both the M.A. and J.R. cases, the plaintiff's claim under 42 U.S.C. § 1983 was based wholly

and completely upon the defendants' violation of the provisions of the IDEA.  M.A., 344 F.3d at

342; J.R., 72 F. Supp. 2d at 178.  Thus, the waiver of immunity under the IDEA acted as a waiver

of liability to suit for damages under § 1983 *for an action based upon a violation of the IDEA.*

By contrast, Plaintiff's action under 42 U.S.C. § 1983 in this case is not based upon any

violation of the IDEA or any other statute in which Congress found it appropriate to abrogate a

1  state's sovereign immunity in exchange for receipt of federal special education funds.  Plaintiff

2  alleges the Defendants violated her rights under the Due Process Clause of the Fourteenth

3  Amendment.  The Ninth Circuit has held that California has not waived its Eleventh Amendment

4  immunity with respect to claims brought under 42 U.S.C. § 1983.  Brown v. California Dep't of

5  Corrections, 554 F.3d 747, 752 (9th Cir. 2009) (finding state board immune from suit under 42

6  U.S.C. § 1983 absent waiver).

7      The Court finds the District, the Board, and the Individual Defendants only to the extent

8  they are sued in their official capacities[9] are immune under the Eleventh Amendment from liability

9  for damages on Plaintiff's claim under 42 U.S.C. § 1983.  Thus, the Court GRANTS the motion

10  for summary adjudication as to Plaintiff's claims against these Defendants.

11  <u>2.</u>      <u>Violation of Constitutional Rights</u>

12      Defendants argue that the Ninth Circuit has never recognized a cause of action against

13  school officials under § 1983 based upon student-to-student sexual assault, and that the facts of

14  this case do not demonstrate Defendants violated Plaintiff's constitutional rights.[10]

15      The Due Process Clause does not impose an affirmative duty upon the state to protect its

16  citizens against the acts of private third parties.  Johnson v. City of Seattle, 474 F.3d 634, 639 (9th

17  Cir. 2007).  As a result, a governmental entity's failure to protect an individual from harm at the

18  hands of a private party generally does not constitute a violation of the Due Process Clause.

19  DeShaney v. Winnebago Co. Dep't of Soc. Servs., 489 U.S. 189 (1989); Johnson, 474 F.3d at 639.

20  There are two exceptions to the general rule announced in DeShaney – the "special relationship"

21  exception and the "danger creation" exception.  Id.  The "special relationship" exception applies

22  where the "government enters into a special relationship with a party, such as taking the party into

23  custody or placing him into involuntary hospitalization."  Morgan v. Gonzales, 495 F.3d 1084,

24  1093-94 (9th Cir. 2007).  Under the "danger creation" exception, "a plaintiff must first show that

25  'the state action affirmatively place[s] the plaintiff in a position of danger,' that is, where state

26  _____

27      [9]In opposition, Plaintiff argues the individual Defendants are not immune from liability under § 1983 to the
extent they are sued in their individual capacities.  Hafer v. Melo, 502 U.S. 21 (1991). Defendants do not dispute this
well-established legal point.

28

      [10]Defendants do not assert they are entitled to qualified immunity.

07cv1266

1    action creates or exposes an individual to a danger he or she would not have otherwise faced."

2    Johnson, 474 F.3d at 639; see also Kennedy, 439 F.3d at 1062.

3          This Court recognized, at the time of Defendants' motion to dismiss, that Plaintiff did not

4    allege sufficient facts to establish a "special relationship."  [Doc. No. 26, p.7.]  Plaintiff did not re-

5    allege this aspect of her due process claim in the amended complaint. Thus, the question at this

6    time is whether there are genuine issues of material fact precluding summary adjudication of

7    Plaintiff's claim that Defendants "affirmatively placed" her in a "position of danger."  The Ninth

8    Circuit has held that "state actors may be held liable 'where they affirmatively place an individual

9    in danger' . . . by acting with "deliberate indifference to [a] known or obvious danger in subjecting

10   the plaintiff to it."  Kennedy, 439 F.3d at 1062 (citing Munger v. City of Glasgow, 227 F.3d 1082,

11   1086 (9th Cir. 2000) and L.W. v. Grubbs, 92 F.3d 894, 900 (9th Cir.1996)).  A plaintiff must show

12   "state action creates or expose[d] [the individual] to a danger which he or she would not have

13   otherwise faced."  Johnson, 474 F.3d at 639.  The Plaintiffs must also demonstrate the danger to

14   which Defendants exposed Jessica was "known or obvious" and that Defendants "acted with

15   deliberate indifference to it."  Kennedy, 439 F.3d at 1064.

16          a.    Case law on "danger creation" exception

17          Although the Ninth Circuit has never applied the "danger creation" exception to a case

18   alleging student-to-student sexual abuse, other Ninth Circuit case law helps to define the scope of

19   the due process right involved in this case.  In Wood v. Ostrander, 879 F.2d 583 (9th Cir. 1989), a

20   police officer arrested a drunk driver and impounded the driver's car at 2:30 a.m.  The officer

21   drove away and left plaintiff, who had been a passenger in the car, alone in an area with a very

22   high rate of aggravated crime. Plaintiff accepted a ride from a stranger who drove her to a secluded

23   area and raped her. Plaintiff sued the police officer. The Ninth Circuit held the plaintiff sufficiently

24   alleged the officer "acted in callous disregard for [her] physical security, a liberty interest

25   protected by the Constitution." Id. at 589. Thus, the court found plaintiff raised a triable issue of

26   fact as to whether the officer's conduct "affirmatively placed [her] in a position of danger."  Id. at

27   589-90.

28          In L.W. v. Grubbs, 974 F.2d 119 (9th Cir. 1992), plaintiff was a prison nurse at a medium

1  security custodial institution for young male offenders.  Plaintiff's supervisors led plaintiff to

2  believe she would not be required to work alone with violent sex offenders. They then assigned

3  her to work alone with an inmate who was a known "violent sex offender" who had "failed all

4  treatment programs" and who was "considered very likely to commit a violent crime if placed

5  alone with a female."  Id. at 120.  The inmate assaulted, battered, kidnapped, and raped plaintiff.

6  The Ninth Circuit found that the defendants used their authority as state correctional officers to

7  affirmatively create the dangerous situation by putting her alone with an inmate who had an

8  extraordinary history of "unrepentant violence against women and girls."  Id. at 121.  Thus, the

9  court held plaintiff could proceed against defendants under the "danger creation" theory.  Id. at

10  122.

11         In Penilla v. City of Huntington Park, 115 F.3d 707 (9th Cir. 1997), police officers locked a

12  seriously ill person in his home and canceled a 911 call. Family members found him dead the next

13  day.  Id. at 709-11. Again, the Ninth Circuit found the defendant officers "took affirmative actions

14  that significantly increased the risk facing" the deceased after they examined him and found him to

15  be in serious medical need.  Id. at 710.

16         In Kennedy, the plaintiff told a police officer that a neighbor (a 13-year-old boy) had

17  molested her 9-year-old daughter. 439 F.3d at 1057-58.  The plaintiff also told the officer initially

18  and on several subsequent occasions that the neighbor boy had alarming violent tendencies, and

19  asked that she be given notice prior to any police contact with the neighbor's family.  Nonetheless,

20  the officer did not notify the plaintiff or her family before he contacted the boy's mother. The

21  officer did notify the plaintiff approximately 15 minutes later, but assured plaintiff that police

22  would patrol the neighborhood that night and she and her family would be safe. The neighbor boy

23  broke into plaintiff's home that night, shot and killed plaintiff's husband, and shot and severely

24  wounded plaintiff.  The district court denied defendant's motion for summary judgment on

25  qualified immunity, and the Ninth Circuit affirmed. The Ninth Circuit found that because the

26  defendant officer knew of the neighbor's violent tendencies, failed to notify plaintiff before he

27  contacted the neighbor, and then misrepresented to the plaintiff the risk they faced if they

28  remained at home, the officer "affirmatively created an actual, particularized danger [plaintiff]

1   would not otherwise have faced." Id. at 1063.  The court further found that the danger to which

2   the defendant officer exposed plaintiff was "known or obvious" and the officer "acted with

3   deliberate indifference to it." Id. at 1064-65.

4          Finally, in Johnson, the plaintiffs attended a Mardi Gras celebration at which several riots

5   broke out.  474 F.3d at 636.  The police chief ordered police to remain on the crowd's periphery

6   because he believed inserting officers into the hostile crowd would incite greater violence.  The

7   plaintiffs were assaulted in the crowd while police remained on the periphery.  The district court

8   granted summary judgment on plaintiffs' claims against the defendants and the Ninth Circuit

9   affirmed.  In contrast to Wood, Grubbs, Penilla, and Kennedy, the court found the plaintiffs had

10  failed to offer any evidence "that the Defendants engaged in affirmative conduct that enhanced the

11  dangers the Pioneer Square Plaintiffs exposed themselves to by participating in the Mardi Gras

12  celebration." Id. at 641.

13          Defendants in their motion rely heavily upon an unpublished decision out of the District of

14  Oregon, Morgan v. Bend-La Pine School Dist., 2009 WL 312423 (D. Or. Feb. 6, 2009), a case

15  which involved student-to-student sexual abuse.  In Morgan, the plaintiff brought an action as

16  *guardian ad litem* on behalf of her daughter, who school district officials placed at an alternative

17  middle school when she was in seventh grade.  Plaintiff was placed at the alternative school after

18  an Individualized Education Plan ("IEP") Team determined she required additional support for her

19  identified disabilities which included ADHD, emotional disturbance, communication disorder, and

20  other health impairments such as muscular dystrophy and severe arthritis. Id. at *2.  Plaintiff was

21  later diagnosed with Autism Spectrum Disorder. Id. at *3.

22          Plaintiff alleged she was particularly susceptible to sexual abuse because she suffered from

23  a disability. In one IEP, her teacher stated that plaintiff did "not understand the social nuances that

24  surround[ed] her, which could easily lead to her becoming a target of more socially 'aware'

25  peers." Id. at *3. At the time she was placed at the alternative school, she was the only female

26  student out of a total of 21 students. Sometime later two other girls began attending the school,

27  both of whom were younger than plaintiff. Id. at *4.  The student population at the school was

28  "very difficult" and included students with histories of violent, acting-out behaviors as well as

07cv1266

1    some students with a history of sexual abuse or who were documented sexual offenders.  Id. at *3.

2           While she was a 14-year-old eighth grade student, plaintiff engaged in several instances of

3    sexually charged conduct with male fellow students while on overnight school trips.  Id. at *4-5.

4    Although school officials learned of one "flashing" incident, they did not notify plaintiff's parents.

5    Id. at *5.  School officials recommended plaintiff be retained at the school for another year, in part

6    due to her need to learn a set of skills to manage her emerging sexuality.  Id. Plaintiff, therefore,

7    remained at the alternative school for a second year of eighth grade.

8           During her second eighth grade year, there were three more sexually charged incidents

9    about which school officials learned.  However, school officials believed there was no "touching"

10   involved in any of the incidents, and also believed there was no force or coercion involved.

11   Therefore, they again did not contact plaintiff's parents. Finally, plaintiff told her parents that on

12   one of the school trips she had masterbated one of the male students, and that on another trip a

13   male student grabbed her crotch.  Plaintiff's parents withdrew her from the school the next day and

14   thereafter filed suit.

15          Defendants moved for summary judgment arguing plaintiff could not show a due process

16   violation.  In granting defendants' motion, the court noted "[n]o Ninth Circuit case has allowed a

17   substantive due process claim premised on a violation of the right to bodily integrity arising out of

18   the failure of teachers or a school district to detect and prevent student-to-student sexual

19   harassment in a public school."  Id. at *10.  The court started with the legal standard for the

20   "danger creation" exception set forth in Kennedy and Grubbs.  Id.  The court then stated, however,

21   that "[t]he ultimate inquiry in any substantive due process case is whether the 'behavior of the

22   governmental officer is so egregious, so outrageous, that it may fairly be said to shock the

23   contemporary conscience' or 'interferes with rights' implicit in the concept of ordered liberty."  Id.

24   at *11 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 (1998)).  The court went on to

25   find that the plaintiff must demonstrate "conduct intended to injure in some way unjustifiable by

26   any government interest [which] is the sort of official action most likely to rise to the conscience-

27   shocking level."  Id. (citing Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008)). The court

28   found none of the facts alleged by plaintiff rose to the "conscience-shocking level," and thus

1   granted summary judgment.

2       Defendants argue the facts of <u>Morgan</u> are almost identical to those in this case, and urge

3   this Court to apply the "shocks the conscience" standard articulated in <u>Morgan</u> to the facts of this

4   case to grant summary judgment on Plaintiff's § 1983 claim.  The Oregon court, however,

5   misstates the standard applicable where a plaintiff alleges a violation of due process under the

6   "danger creation" exception.  The standard for determining whether a plaintiff has stated a due

7   process violation under the "danger creation" theory is set forth in the Ninth Circuit cases cited

8   above, including <u>Kennedy</u>, <u>Grubbs</u>, and <u>Johnson.</u>  The Ninth Circuit in <u>Kennedy</u> expressly rejected

9   the proposition that a plaintiff alleging a due process violation under the "danger creation" theory

10  must meet a "shocks the conscience" standard.  439 F.3d at 1064-65.  Therefore, the Court will not

11  apply a "conscience-shocking" standard as the court did in <u>Morgan</u>.

12          b.       Application of the law to the facts of this case

13      The questions raised by Plaintiff's § 1983 claim in this case are (i) whether the

14  Defendants[11] affirmatively placed Plaintiff in a position of danger, (ii) whether the danger to which

15  Defendants exposed Plaintiff was known or obvious, and (iii) whether Defendants acted with

16  deliberate indifference to that risk. <u>Kennedy</u>, 439 F.3d at 1062-63, 1064.

17              *i. Did the Defendants affirmatively place Plaintiff in a position of danger?*

18      Defendants argue there is no evidence demonstrating the Defendants "affirmatively placed

19  Plaintiff in a position of danger."  The question is whether Defendants took "any affirmative

20  actions ... [which] placed [Jessica] in danger that she otherwise would not have faced."  <u>Kennedy</u>,

21  439 F.3d at 1062.

22      The Court finds that the facts, viewed in the light most favorable to Plaintiff, could be

23  construed so as to establish all Defendants affirmatively placed Plaintiff in a position of danger.

24  Defendants Mr. Jiminez and Ms. Skinner made the decision to place Ortiz as a peer tutor in the

25

26          [11]In opposition to the Defendants' motion, Plaintiff argues Ortiz himself was a state actor because he was
27  acting as an agent on behalf of the school.  The Court doubts Plaintiff could demonstrate Ortiz was a "state actor" for
    purposes of 42 U.S.C. § 1983.  <u>See</u> <u>Sutton v. Providence St. Joseph Medical Ctr.</u>, 192 F.3d 826, 835-36 (9th Cir. 1999)
28  (discussing the factors federal courts use to determine when a private party is acting under "color of state law" for
    purposes of § 1983).  Nonetheless, Plaintiff amended her complaint to delete all claims against Ortiz, and Plaintiff
    cannot now attempt to establish liability under § 1983 against him personally.

1   ILS classroom as discipline for making derogatory comments directed toward another student on

2   MySpace, and Defendant Ms. Skinner physically made the change to Ortiz's schedule.  In

3   addition, when Ortiz returned to Serra High School for the spring 2006 semester, after he had been

4   suspended for gambling, Ms. Skinner affirmatively placed Ortiz back in the ILS classroom as a

5   peer tutor.  Ortiz would not have been in the ILS classroom except for the affirmative actions of

6   Mr. Jiminez and Ms. Skinner to place him there as a peer tutor.

7        Furthermore, Defendant Ms. Chambers allowed Ortiz to work with Plaintiff despite her

8   knowledge that Jessica, like all the ILS students, was particularly vulnerable to sexual abuse.[12]  In

9   a meeting on March 31, 2006, Plaintiff's mother expressed concern to Ms. Chambers about male

10  tutors working with her daughters and specifically told Ms. Chambers that she did not want that

11  happening any more.  [Chambers Depo., 127:7-12.]  Nonetheless, Defendant Ms. Chambers

12  continued to allow Ortiz to work with Jessica in the ILS classroom, thus affirmatively placing

13  Jessica in a position of danger.

14       *ii.  Was the Danger to Plaintiff Known or Obvious to Defendants?*

15       None of the Defendants knew Ortiz had been previously disciplined for sexual harassment.

16  Therefore, Defendants argue the risk to Plaintiff of having Ortiz work as a peer tutor in the ILS

17  classroom was neither known nor obvious.  Defendants take too narrow a view of the evidence in

18  this case.

19       In order to establish Defendants knew or should have known they were making Plaintiff

20  vulnerable to danger by placing Ortiz in the ILS classroom as a peer tutor, it is not necessary that

21  Defendants foresaw the specific injury Ortiz inflicted upon Plaintiff.  <u>Kennedy</u>, 439 F.3d at 1064

22  fn.5 (where officer knew neighbor had alarming, violent tendencies, court found plaintiff need not

23  demonstrate officer knew neighbor would shoot and kill plaintiff's husband); <u>Wood</u>, 879 F.2d at

24  590 (where officer left plaintiff alone in a high crime area in the middle of the night, court found

25  plaintiff did not need to demonstrate the officer knew she would be raped)  All of the Defendants

26  knew Plaintiff was particularly vulnerable to sexual abuse and would be unable to defend herself

27

28       [12]Plaintiff's argumentative statement that Ms. Chambers had  "duty to screen each tutor" [Opposition Brief, p. 12, ¶ 55] is not supported by the evidence of record cited by Plaintiff.

07cv1266

against or report such abuse.  Against the backdrop of such knowledge, and knowing that Ortiz had a significant disciplinary history which included fighting, making threats against another student, and sexual harassment, Defendant Mr. Jiminez recommended that Ortiz be made a peer tutor in the ILS classroom.  The Court finds the evidence viewed in the light most favorable to Plaintiff raises a genuine issue of material fact as to whether Defendant Mr. Jiminez knew or should have known he was making Plaintiff vulnerable to danger by placing Ortiz in the ILS classroom as a peer tutor.

Although Defendant Ms. Skinner was not as familiar with Ortiz's disciplinary history as Defendant Mr. Jiminez, the facts viewed in the light most favorable to Plaintiff indicate Ms. Skinner was present during Ortiz's post-suspension meeting in the fall of 2005, and participated in the decision to put Ortiz in the ILS classroom.  During that meeting, Mr. Jiminez warned Ortiz that he would be expelled and unable to return to school if he incurred another disciplinary infraction. This warning should have put Ms. Skinner on notice that before she made the change to Ortiz's schedule she should look at his disciplinary history to insure it was an appropriate placement. Furthermore, Ms. Skinner knew Ortiz was again suspended from Serra High School, only about a week after this meeting, and returned to the school in the spring semester of 2006.  Despite this knowledge, Ms. Skinner made sure Ortiz's schedule, when he returned to school, once again included him as a peer tutor in the ILS classroom. The Court finds such facts create a genuine issue of material fact as to whether Defendant Ms. Skinner knew or should have known Ortiz would be a danger to Plaintiff.

Finally, it is undisputed that Defendant Ms. Chambers did not know anything about Ortiz's disciplinary history, aside from the fact he was returning to school after having been suspended the remainder of the fall 2005 semester. However, Ms. Chambers had knowledge neither of the other two Defendants possessed – she knew Plaintiff's mother was specifically concerned that her daughter did not know proper boundaries and therefore could easily be the victim of sexual abused at the hands of male tutors in the ILS classroom.  [Chambers Depo., 131:3-16.]  Thus, the Court finds there is a genuine issue of material fact as to whether Defendant Ms. Chambers knew or should have known Ortiz would be a danger to Plaintiff.

iii.     *Were Defendants Deliberately Indifferent to the Known or Obvious Danger?*

Although the Court believes this is a very close case, the Court concludes there are genuine issues of material fact precluding summary adjudication on the question of whether Defendants were deliberately indifferent to the known or obvious risk that Plaintiff would be harmed if Ortiz worked in the ILS classroom as a peer tutor.  As clarified above, contrary to Defendants' argument in their motion, the Ninth Circuit does not require a plaintiff to demonstrate that the defendants' conduct is "conscious shocking" or "gross negligence."  <u>Kennedy</u>, 439 F.3d at 1064-65.  The question is whether the Defendants acted "with deliberate indifference to the known and obvious danger."  <u>Id</u>. at 1064.

Here, the facts when viewed in the light most favorable to Plaintiff are sufficient to establish for summary adjudication purposes that all Defendants acted deliberately and indifferently to the danger they created by assigning Ortiz as a peer tutor in the ILS classroom and allowing him to continue to work with Plaintiff.  Despite their knowledge that Ortiz had a history of disciplinary problems, Defendants Mr. Jiminez and Ms. Skinner assigned Ortiz to work as a peer tutor in the ILS classroom with students whom they knew were particularly vulnerable to abuse.  Defendant Ms. Chambers, despite knowing Ortiz was returning from having been suspended, despite knowing Plaintiff was particularly vulnerable to abuse, and despite having been told by Plaintiff's mother that she did not want male tutors working with her daughter, allowed Ortiz to work one-on-one with Plaintiff without a sufficient level of supervision by an adult aide.

Based thereon, the Court finds there exists genuine issues of material fact precluding summary adjudication of Plaintiff's claim under 42 U.S.C. § 1983 as against each of the Individual Defendants sued in their individual capacities.  Defendants' motion is DENIED.

*3.     Punitive Damages*

Defendants also move for summary adjudication on Plaintiff's claim for punitive damages.  Defendants acknowledge that punitive damages may be awarded upon a finding of liability under 42 U.S.C. § 1983 where the jury also finds the defendant's conduct was motivated by evil motive or intent, or involves reckless or callous indifference to federally protected rights.  <u>Smith v. Wade</u>,

461 U.S. 30, 56 (1983). Defendants, argue there is no evidence to suggest punitive damages would be appropriate in this case.

The Court agrees.  In her three sentence opposition to the Defendants' motion with regard to punitive damages, Plaintiff conflates the showing required to establish her claim under 42 U.S.C. § 1983 with the standard for punitive damages.  Plaintiff points to no evidence of record demonstrating that any of the Defendants' conduct was motivated by "evil motive or intent, or involves reckless or callous indifference to federally protected rights."  Therefore, the Court GRANTS Defendants' motion for summary adjudication of Plaintiff's claim for punitive damages.

*Conclusion*

For the reasons set forth herein, the Court:

1. DENIES Plaintiff's motion for a continuance under Fed. R. Civ. Proc. 56(f);

2. GRANTS Defendants' motion for summary adjudication of Plaintiff's claim under 42 U.S.C. § 1983 as to the District, Board, and individual Defendants in their official capacities, because Plaintiff's claims are barred by the Eleventh Amendment;

3. DENIES Defendants' motion for summary adjudication on the merits of Plaintiff's claim under 42 U.S.C. § 1983 against the individual Defendants in their individual capacities; and

4. GRANTS Defendants' motion for summary adjudication of Plaintiff's claim for punitive damages.

**IT IS SO ORDERED**.

**DATED:  May 13, 2009**

**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

- 22 -

07cv1266