Jeffrey L. Weeks, Esq., *Pro Hac Vice*
WEEKS & LUCHETTA, LLP
102 South Tejon, Suite 910
Colorado Springs, CO 80903
Telephone:   (719) 578-5600
Facsimile:   (719) 635-7458
jeffrey@weeksluchetta.com

David M. Poore, SBN 192541
KAHN BROWN & POORE LLP
30 Fifth Street, Suite 200
Petaluma, California 94952
Telephone:   (707) 763-7100
Facsimile:   (707) 763-7180
dpoore@kahnbrownlaw.com

Attorneys for Plaintiff
JESSICA SCHROEDER

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JESSICA SCHROEDER, BY AND THROUGH HER GUARDIAN AD LITEM, MARINA LANERI SCHROEDER,<br><br>            Plaintiffs,<br><br>v.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT; et al.,<br><br>            Defendants. | Case No.  3:07-cv-01266 IEG-RBB<br><br>**PLAINTIFF'S REPLY BRIEF TO THE RESPONSE OF AMY AND TOM VANDEVELD TO MOTION TO STRIKE THE ATTORNEY LIEN**<br><br><br>**Date:  May 3, 2010**<br>**Time: 10:30 a.m.**<br>**Ctrm: 1**<br><br> Hon. Irma E. Gonzalez |

# TABLE OF CONTENTS

I. REPLY ARGUMENT ............................................................................................... 1

    A. The Vandevelds' Argument that they had an Ethical Imperative to Withdraw from this Case is Incorrect. ........................................................................................... 1

        1. There was No Conflict of Interest. ................................................................... 1

        2. There was No Reasonable Likelihood of Perjured Testimony. ...................... 3

    B. The Vandevelds Voluntarily Withdrew from this Case Based Upon Nothing More than a Personality Conflict with Jessica's Guardian Ad Litem. ...................................... 7

    C. The Attorney Lien Provision in the Retainer Agreement does Not Comply with California Rule of Professional Conduct 3-300, and It is Not Enforceable. .......................... 8

    D. The Vandevelds Cannot Claim a Recovery in *Quantum Meruit*. ......................... 9

        1. The Vandevelds' Withdrawal was Not Mandatory under State Bar Rules. .... 9

        2. The Vandevelds' Primary Motivation for Withdrawal was Not an Adherence to Ethical Standards. ............................................................................................. 10

        3. The Vandevelds' Work on this Case Did Not Contribute to Any Measurable Degree Towards Jessica's Recovery. ......................................................................... 11

II. CONCLUSION ...................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Cohen v. Brown,*
    173 Cal.App.4th 302, 317-318 (2009) .................................................................................. 1

*Estate of Falco v. Decker,*
    188 Cal.App.3d 1004, 1016 (1987)..................................................................................... 9

*Forte Capital Partners, LLC v. Harris Cramer LLP,*
    2009 U.S. Dist. LEXIS 65963 (N.D. Cal., July 21, 2009)................................................... 8

*Jeffry v. Pounds,*
    67 Cal.App.3d 6, 9-10 (1977) ............................................................................................. 2

*Jessen v. Hartford Casualty Insurance Company,*
    111 Cal. App. 4th 698 (2003).............................................................................................. 2

*Moore v. Fellner,*
    50 Cal.2d 330, 341 (1958) .................................................................................................. 7

*Rus, Miliband & Smith v. Conkle & Olesten,*
    113 Cal. App. 4th 656, 674-675 (2003) ..................................................................... 1, 9, 10

*Truck Insurance Exchange v. Fireman's Fund Insurance Company,*
    6 Cal. App. 4th 1050, 1059 (1992)...................................................................................... 2

**Other Authorities**

Weil & Brown, *Civil Procedure Before Trial,* §1:60 (TRG 2009).................................................. 2

**Rules**

Cal. R. Prof. Cond. 3-300............................................................................................................... 8

**I.     REPLY ARGUMENT**

**A.     The Vandevelds' Argument that they had an Ethical Imperative to Withdraw from this Case is Incorrect.**

    1.     **There was No Conflict of Interest.**

The Vandevelds' argument that they had an ethical imperative to withdraw from this case is not credible. Here, the Vandevelds argue that they had a mandatory duty to withdraw from this case under the State Bar rules because Jessica's mother had created a "conflict of interest". This claim is baseless. First, nowhere in any of their communications is there any reference to a "conflict of interest" that required mandatory withdrawal from representation under the State Bar rules. In their response, the Vandevelds attach dozens of emails and communications between Jessica's mother and Guardian Ad Litem ("GAL"), Marina Schroeder, in an obvious attempt to portray her as a liar that caused a conflict of interest that required mandatory withdrawal. However, none of the emails or other communications notified Jessica or Ms. Schroeder that the Vandevelds were compelled to withdraw because of a "conflict of interest". *Rus, Miliband & Smith v. Conkle & Olesten,* 113 Cal. App. 4th 656 (2003) [attorneys must explain the reasons for withdrawal, and cannot later rely upon undisclosed reasons]. Instead, the vast majority of the communications simply show that there were personality clashes between Amy Vandeveld and Marina Schroeder that caused a breakdown in the attorney-client relationship.[1] Such a breakdown does not constitute good cause to withdraw from a contingency fee case, and later make a claim for attorney's fees. *Estate of Falco v. Decker,* 188 Cal. App. 3d 1004 (1987) [personality clashes between the client and lawyer does not constitute good cause to withdraw and later claim an attorney lien].

---

[1] The Vandevelds argue that this "conflict of interest" would have been discovered if plaintiff's counsel, Mr. Weeks and Mr. Poore, had fulfilled their "ethical obligation" to adequately investigate the June 27, 2008, email in which Amy Vandeveld gives notice of withdrawal. Since it is improper for an attorney to (even implicitly) accuse an opposing counsel of ethical violations to obtain a litigation advantage, Mr. Weeks and Mr. Poore will not respond at this point other than to say the allegations are not well taken. *Cohen v. Brown,* 173 Cal.App.4th 302, 317-318 (2009). If the Court desires a response, we will do so at the hearing.

-1-

Second, there was never any conflict of interest because the Vandevelds never advised the plaintiffs[2] in writing or otherwise to each seek the advice and representation of separate counsel. Under California law, when an actual conflict of interest arises between two clients in joint representation, an attorney cannot seek to jointly represent the clients in that proceeding, and must advise the clients that they should each seek the advice of separate counsel. *Truck Insurance Exchange v. Fireman's Fund Insurance Company,* 6 Cal. App. 4th 1050, 1059 (1992) [attorney cannot avoid disqualification by dropping one client and representing the other]; *Jessen v. Hartford Casualty Insurance Company,* 111 Cal. App. 4th 698 (2003); *see also* Weil & Brown, *Civil Procedure Before Trial,* §1:60 (TRG 2009) [This is known as the "hot potato rule" under California law]. Here, the Vandevelds claim that they were required to withdraw under State Bar rules because Jessica's GAL had created a conflict of interest. However, despite this claim, the Vandevelds never advised the plaintiffs in writing to seek the representation of separate counsel, and, instead, they told Ms. Schroeder to seek the advice of a new attorney to jointly represent both of them; again, strong evidence that there was never any "conflict of interest".

As the Vandevelds admit, they offered to continue to represent the plaintiffs at the upcoming depositions *even though there was this alleged conflict of interest*; again, strong evidence that there never really was any conflict of interest. If there was an actual conflict of interest that existed in June 2008, as the Vandevelds allege, then they are not permitted to jointly represent either Jessica or her mother at any legal proceedings. *Jeffry v. Pounds,* 67 Cal.App.3d 6, 9-10 (1977) [attorney cannot represent husband in a personal injury action and wife in the dissolution proceeding]. Instead, they must withdraw, and advise the clients to each seek separate lawyers. As a result, the Vandevelds' belated claim that there was a conflict of interest that required withdrawal is contradicted by their own communications and behavior.

---

[2] Jessica and Marina Schroeder are occasionally referred to collectively as "plaintiffs" in this Reply since the Vandevelds represented both Jessica and Ms. Schroeder as joint plaintiffs in this action. Once Ms. Schroeder retained Mr. Weeks, she agreed to voluntarily dismiss her claims so that the appropriate focus of this case could be her daughter.

-2-

There were also options the Vandevelds could have pursued to solve any perceived problem with Marina. First, they could have asked Marina whether she would be willing to dismiss her personal claims – like she did soon after she obtained new attorneys to represent Jessica. Second, the Vandevelds could have moved to have another person appointed as the legal guardian for Jessica in this litigation and continued to prosecute Jessica's claims.

The Vandevelds make much of a perceived credibility gap between Marina Schroeder's statements and the medical records regarding a "father" or "step-father" in two medical records. That argument is a red herring, and it falls far short of mandating the Vandevelds' withdrawal from the case. The undersigned and Mr. Weeks prosecuted the case with full disclosure of the medical records, and that issue never came up. It would be nothing more than rank speculation to argue that some mystery man caused Jessica any harm. Despite the disclosure of all medical records, including the two records seized upon by the Vandevelds, the defense never even mentioned that matter during this lawsuit.

Moreover, there is nothing unusual about a conflict between a witness' testimony and statements in medical records. Plaintiff's lawyers routinely deal with a witness' credibility issues. If plaintiffs' lawyers had to withdraw every time there was an apparent conflict between some document and a client's testimony, very few plaintiffs would have lawyers. Here, Mr. Weeks and Mr. Poore fully disclosed all medical records, dealt with all of the credibility issues and still secured a settlement of $400,000 for Jessica. The Vandevelds simply decided to withdraw from the case because of a personality conflict with Marina Schroeder and the apparent unwillingness to accept the risks involved in this contingent case, perform all of the work and incur the very substantial expenses necessary to prosecute Jessica's claims.

2.  **There was No Reasonable Likelihood of Perjured Testimony.**

There was also no perjured testimony or any reasonable concern that there would be perjured testimony. In their response, the Vandevelds claim that they had an ethical obligation to withdraw because they believed that Jessica's GAL would offer perjured testimony at deposition or trial. In particular, the Vandevelds argue that they became aware in June 2008 that Ms.

-3-

Schroeder was going to offer deposition testimony that contradicted Jessica's medical records. Again, the evidence shows that this is nothing more than a litigation-generated argument that is being asserted after the fact so as to enable the Vandevelds to receive money from Jessica's settlement.

First, the claim that the Vandevelds suddenly became concerned with "inconsistencies" between Ms. Schroeder's expected testimony and the medical records in June 2008 is not persuasive. The Vandevelds' own evidence shows that they were aware of these alleged inconsistencies back in August 2006, but they continued to represent the plaintiffs because Ms. Schroeder had provided reasonable explanations for the inconsistencies in the medical records. For example, in an email dated August 25, 2006, the Vandevelds questioned Ms. Schroeder about alleged inconsistencies in the medical records pertaining to Jessica's "aggressive" behavior. (Ex. 1, A. Vandeveld Decl.) In response, Ms. Schroeder advised the Vandevelds that Jessica had fought with her sister in the past (as most siblings do), but Jessica's aggression had become much more pronounced after the sexual assault. The Vandevelds accepted her explanation and made no attempt to withdraw.

Likewise, in an email dated December 11, 2006, the Vandevelds questioned Ms. Schroeder about inconsistencies in the medical records pertaining to aggression and Jessica's post-assault behavior, including Jessica's "wandering" at night, and Ms. Schroeder again provided reasonable responses. (Ex. 3, A. Vandeveld Decl.) The Vandevelds accepted those explanations and made no attempt to withdraw. If the Vandevelds were so concerned about Ms. Schroeder's alleged inconsistencies and lies about Jessica's behavior, why did they wait for almost two years to withdraw in June 2008? The answer is simple: again, this is nothing more than a litigation-generated argument to obtain attorney's fees from Jessica's settlement.

Second, the Vandevelds claim that they were required to withdraw from representation because Ms. Schroeder lied about a man living in the house, when the medical records showed a "father" or "step-father" living at the residence in 2006. However, as the evidence shows, this entry in the medical record was an error that was immediately corrected by Ms. Schroeder. In

-4-

particular, the Chadwick medical records make reference to a "step-father" and "father" in one section of a medical entry in 2006, but, under the Social History section, it contradicts this earlier entry and unambiguously states that Jessica lived with a mother, twin sister, and occasionally a 22-year old brother in 2006. There is no reference to any "father" or "step-father" in the Social History section. Furthermore, when Ms. Schroeder questioned Chadwick about this inconsistency, it admitted that the records were not accurate and advised Ms. Schroeder that the records would be amended to reflect the correct information. (Ex. 4, 5, 7, A. Vandeveld Decl.) When Ms. Schroeder explained this correction to the Vandevelds, they criticized Ms. Schroeder by stating that her efforts at amendment would "bring more attention" than the actual inconsistency itself. (Ex. 6, A. Vandeveld Decl.). Accordingly, there were no lies about a "father" or "step-father".

Third, the Vandevelds argue that Ms. Schroeder lied about a "boyfriend" living in the house, and when the Vandevelds confronted her about this supposed lie, she admitted that a boyfriend, Mr. Ostrowski, had in fact stayed overnight at the house. However, what the Vandevelds fail to recognize is that Ms. Schroeder told them that she did have a relationship with this man *back in 1992 through 1994* – more than 12 years before the sexual assault on Jessica. (Ex. 7, A. Vandeveld Decl. ["there was no man living in the house since 1994 … I had a relationship from May 92 to Nov 94"].) As Ms. Schroeder truthfully told the Vandevelds on many occasions, she had no "boyfriend" staying the night at the house in 2006.[3]

Fourth, the Vandevelds argue that Ms. Schroeder had supposedly lied about the fact that Dr. Grossman supported the case. However, the Vandevelds fail to submit any evidence that actually shows that Dr. Grossman did not support this case. The Vandevelds did not interview Dr. Grossman, and they never took Dr. Grossman's deposition. Moreover, Dr. Grossman is a

---

[3] Plaintiff fails to see how Ms. Schroeder's alleged intimate relationship would have any relevancy to this action, or how it would be admitted into evidence over privacy and relevancy objections. This is not a sexual assault case in which the defendant is attempting to claim that the child was sexually assaulted by some other person, including a potential boyfriend. Instead, Ortiz was convicted in state court on all counts of sexual assault, and he openly admitted (in both court and deposition) that he engaged in the sexual acts with Jessica.

-5-
PLAINTIFF'S REPLY BRIEF RE MOTION TO STRIKE ATTORNEY LIEN(S) OF AMY AND TOM VANDEVELD, ATTORNEYS-AT-LAW
SCHROEDER V. S.D.U.S.D, ET. AL.                                           CASE NO. **3:07-cv-01266 IEG-RBB**

neurologist, and she deals with Jessica's *seizures*. She is not qualified to render an opinion regarding matters outside of Jessica's seizures. After the Vandevelds withdrew from the case, neither the plaintiff nor the defense bothered taking the deposition of Dr. Grossman because her testimony about Jessica's seizures is not germane to the lawsuit.

In contrast with Dr. Grossman, there is a health care provider that is qualified to render opinions regarding Jessica's problems as a result of the sexual abuse: Raphael Morris, M.D., who is a board certified psychiatrist. Dr. Morris has treated Jessica since the sexual abuse, and he supports the plaintiff's claim of damages resulting from the sexual abuse. It is his opinion that the sexual abuse caused Jessica to suffer PTSD-like symptoms, and, as a result, he prescribed Seroquel for Jessica. (Ex. D, Poore Suppl. Decl., Morris Depo., p. 26:1-25.)

While the Vandevelds argue that there were no fact witnesses that supported Marina Schroeder's testimony regarding the before/after difference in Jessica, Mr. Weeks and Mr. Poore simply interviewed one of the Schroeders' neighbors, Reen Benson, and she provided an affidavit that plainly supports Marina Schroeder's testimony regarding the before/after change in Jessica. (Ex. F, Poore Suppl. Decl.)

The facts demonstrate that the Vandevelds did not withdraw from this case on the basis of Ms. Schroeder's supposed perjured testimony. The Vandevelds never advised plaintiffs in writing that they were withdrawing due to any concern over suspected perjured or false testimony. The Vandevelds were merely confronted with the typical difficulties faced by many plaintiffs' lawyers, and they decided to voluntarily withdraw from the case rather than proceed forward with the case and invest the necessary funds to retain appropriate expert witnesses. A determined lawyer could have candidly, ethically and honestly addressed each witness' credibility issues, gathered the evidence necessary to prosecute the case and achieved a fair settlement for Jessica.

\\\

### B. The Vandevelds Voluntarily Withdrew from this Case Based Upon Nothing More than a Personality Conflict with Jessica's Guardian Ad Litem.

The evidence shows that the Vandevelds voluntarily withdrew from this case based primarily upon a personality conflict between Amy Vandeveld and Ms. Schroeder. The evidence that the Vandevelds attached to their response shows multiple accounts of Ms. Schroeder and Amy Vandeveld butting heads in 2008 over how to successfully prosecute this case. The evidence shows several heated discussions between Ms. Schroeder and Ms. Vandeveld regarding the settlement value of the case, which doctors to use as experts, which witnesses should be called at trial, the magnitude of alleged evidentiary problems with the case, and the scheduling of appointments to speak with medical providers, including Dr. Grossman. In the emails, Ms. Vandeveld openly accused Ms. Schroeder of "questioning [her] advocacy of [Jessica]", questioning her "integrity", and Ms. Vandeveld found it "very disturbing" that Ms. Schroeder would dare to question her handling of the case. (Ex. 6, A. Vandeveld Decl.)

While this evidence may show a difficult and strained attorney-client relationship, it does not support a finding of "good cause" to later make a claim for attorney fees. Mere personality conflicts, arguments between attorneys and clients, and other similar breakdowns in the attorney-client relationship do not constitute "good cause" for voluntary withdrawal. *Estate of Falco v. Decker,* 188 Cal. App. 3d 1004 (1987) [personality clashes between the client and lawyer does not constitute good cause to withdraw and later claim an attorney lien]; *Rus, Miliband & Smith v. Conkle & Olesten,* 113 Cal. App. 4th 656 (2003) [an attorney who voluntarily withdraws from a case because of a breakdown in the attorney client relationship forfeits any recovery for attorney's fees]; *Moore v. Fellner,* 50 Cal. 2d 330, 341 (1958) ["an attorney who wrongfully abandons or withdraws from a case which he has contracted to handle … may not recover compensation."]; *Marrero v. Christiano,* 575 F. Supp. 837 (S.D.N.Y. 1983) ["Where an attorney withdraws without good and sufficient cause, his lien is *automatically* forfeited." (citing cases; emphasis in original).] Accordingly, the motion to strike the Vandevelds' attorney lien must be granted.

**C.     The Attorney Lien Provision in the Retainer Agreement does Not Comply with California Rule of Professional Conduct 3-300, and It is Not Enforceable.**

The Vandevelds admit in their response that the Attorney Lien provision in their various retainer agreements did not contain the mandatory disclosure required by California Rule of Professional Conduct 3-300(B). *See Forte Capital Partners, LLC v. Harris Cramer LLP,* 2009 U.S. Dist. LEXIS 65963 (N.D. Cal., July 21, 2009) ["the attorney lien was not valid because the attorney failed to comply with California Rule of Professional Conduct 3-300" by not including the required disclosure]. Instead, they claim that their Attorney Lien provision, which is contained on Page 6 of the retainer agreement, complies with Rule 3-300 because a separate provision on Page 4, the Conflict of Interest section, states that the clients "are urged to contact independent counsel to discuss the effect of *this provision* before agreeing to it." (Ex. 13, A. Vandeveld Decl. [emphasis added].)

This argument fails on its face. The retainer agreement does not advise the plaintiffs to seek the advice of independent counsel to discuss the effect of the Attorney Lien provision. This section merely advises the plaintiffs to contact independent counsel to discuss the effect of the Conflict of Interest provision in the fee agreement. The fee agreement unmistakably limits this disclosure to "this provision", which references only the Conflict of Interest section. This disclosure does not equally advise the potential clients to seek independent advice regarding the effect of any Attorney Lien provision. Since it is undisputed that the Attorney Lien provision contains no such similar disclosure, it is invalid as a matter of law. Cal. R. Prof. Cond. 3-300(B); *Forte Capital Partners, LLC v. Harris Cramer LLP,* 2009 U.S. Dist. LEXIS 65963 (N.D. Cal., July 21, 2009).

The Vandevelds reliance upon *In re Popov,* 2007 U.S. Dist. LEXIS 51357 (N.D. Cal., July 3, 2007), for the proposition that their disclosure complies with Rule 3-300(B) is misplaced. As the *Popov* court made clear, it was rendering no opinion as to whether the Attorney Lien provision complied with Rule 3-300(B). *Id.* at fn. 6. Instead, the district court in *Popov* recognized the familiar rule that subsection (B) of Rule 3-300 required an attorney to advise the

-8-

client to seek the advice of independent counsel with respect to an Attorney Lien provision, but did not need to reach that issue. Here, it is undisputed that the Vandevelds failed to provide any such disclosure to the plaintiffs as it pertained to the Attorney Lien provision. Accordingly, the lien must be stricken.

**D.   The Vandevelds Cannot Claim a Recovery in *Quantum Meruit*.**

The Vandevelds also cannot make a claim for *quantum meruit* because they failed to establish that: (1) their withdrawal was mandatory, not merely permissive, under statute or State Bar rules; (2) the overwhelming and primary motivation for their withdrawal was the obligation to adhere to these ethical imperatives; and (3) their work contributed in some measurable degree towards the clients ultimate recovery. *Estate of Falco v. Decker,* 188 Cal.App.3d 1004, 1016 (1987) [attorney seeking recovery in quantum meruit must establish these elements]; *Rus, Miliband & Smith v. Conkle & Olesten,* 113 Cal.App.4th 656, 674 (2003).

**1.   The Vandevelds' Withdrawal was Not Mandatory under State Bar Rules.**

As explained above, the Vandevelds' withdrawal was not mandatory under the State Bar rules. Contrary to their new found assertions, there is no credible evidence that the Vandevelds voluntarily withdrew from this action in June 2008 due to some undisclosed "conflict of interest". The Vandevelds never advised the plaintiffs in writing that they were withdrawing because of a conflict of interest, and their subsequent conduct only demonstrates that this new reason has been created to justify an award of fees.

Likewise, there is no evidence that the Vandevelds withdrew from this case because they believed that perjured testimony was imminent. As noted above, Ms. Schroeder had repeatedly provided reasonable explanations for the alleged "inconsistencies" in the medical records; Chadwick, the medical provider, admitted that the "father" and/or "step-father" entry was a mistake; and the Vandevelds have offered no explanation as to why they waited until June 2008 to withdraw as a result of these alleged inconsistencies when they questioned Ms. Schroeder about them back in August and December 2006. Additionally, and more importantly, the Vandevelds never told the plaintiffs in writing that they were withdrawing due to their concern

-9-

over perjured testimony. Instead, the Vandevelds warned Ms. Schroeder about their concerns about credibility issues on June 11, 2008, but they continued to represent the plaintiffs in spite of that information. In short, the evidence fails to demonstrate that the Vandevelds withdrew from this case due to their concerns about perjured or inconsistent testimony.

### 2. The Vandevelds' Primary Motivation for Withdrawal was Not an Adherence to Ethical Standards.

Even if Ms. Schroeder's conduct may have triggered some ethical concerns, there is no evidence that the Vandevelds' primary motivation for withdrawal was an adherence to ethical rules. In her withdrawing email, Amy Vandeveld makes no citation to any "conflict of interest" or concern about "perjured testimony". Instead, Ms. Vandeveld was merely upset because Ms. Schroeder was continuing to question her "integrity" and handling of the case as it pertained to a discovery cost matter. Ms. Vandeveld had made it clear in the past that she was upset with Ms. Schroeder's "questioning" of the handling of Jessica's case, and, when she received Ms. Schroeder's email, she made the decision to withdraw. However, such personality clashes and/or refusal to cooperate do not amount to good cause for mandatory withdrawal. *Rus, Miliband & Smith v. Conkle & Olesten, supra,* 113 Cal. App. 4th at 674-675 ["simply writing a letter containing some (to take the [attorney's] interpretation of the letter) insulting implications is not enough. Some clients do insult their attorneys, but mere insult is not one of the reasons for *mandatory* withdrawal listed in Rules of Professional Conduct, rule 3-700(B)."]

Additionally, it is equally apparent that the Vandevelds withdrew from this case because Ms. Schroeder was not willing to accept what they considered to be a reasonable settlement proposal. The best evidence of the Vandevelds state of mind on this point is contained in the redacted portion of Exhibit 6 – the part of the email that the Vandevelds failed to include for the Court's review. At the conclusion of the email, the Vandevelds summed up their position:

> You need to be prepared to receive a Settlement Offer significantly less than the amount demanded in the SDUSD Claim Forms. Based upon the factual developments of this case, you should also be prepared, if necessary, to accept a settlement offer that may be substantially less than what you initially expected. *If the facts warrant acceptance of a much*

-10-

> *smaller offer, in my opinion, and you refuse to accept what I consider to be a reasonable settlement offer, I may choose to withdraw from this case.*

(Ex. E, Poore Suppl. Decl, emphasis added.)

Not surprisingly, the Vandevelds withdrew approximately two weeks later when Ms. Schroeder made it clear that she would not compromise her daughter's case for "significantly" less that its value. As a result, the evidence indicates that the true motivation of the Vandevelds in withdrawing had less to do with any adherence to ethical imperatives than the Vandevelds' desire to settle for a low amount without much cost or litigation. The Vandevelds were upset that Ms. Schroeder was questioning their prosecution of this case, and they were equally upset that she would not agree to settle this case for substantially less than its reasonable value.

### 3. **The Vandevelds' Work on this Case Did Not Contribute to Any Measurable Degree Towards Jessica's Recovery.**

Even assuming that the Vandevelds could establish that they had a mandatory ethical obligation to withdraw, their work did not contribute in some "measurable degree" towards Jessica's recovery.

The Vandevelds appear to work primarily on disability access cases, and they do not seem to be experienced in sexual abuse, school negligence or § 1983/danger creation cases. Their handling of this case was far from aggressive or effective, and their hourly rate of $350 per hour seems very high given their apparent inexperience in this type of litigation. Also, their creation of hourly records long after-the-fact calls into question the accuracy of the time records.

The Vandevelds prosecuted this case for two years. During that period of time, they conducted no depositions, conducted none of the necessary interviews of witnesses, spoke to none of plaintiffs' medical providers, retained no experts[4], served only minimal written discovery, and spent most of their time trying to chase an insurance bad faith claim against Ortiz' parents'

---

[4] The Vandevelds attempt to argue that they did retain experts by pointing to the sole invoice of Dr. Shakeshaft for the retainer amount of $2,500.00. However, there is no evidence that the Vandevelds actually retained Dr. Shakeshaft, and given that they are only seeking costs in the amount of approximately $1,800.00, it is obvious that they never sent Dr. Shakeshaft any retainer check.

-11-

insurance company because they had denied the third-party claim. *The Vandevelds incurred only $1,800 in litigation expenses.* The Vandevelds also originally filed this case in federal court causing Jessica to lose her § 1983 claims against the school district on summary judgment.

The Vandevelds spent much of their time pursuing claims that had scant, if any, value, such as their ADA claim. They also spent considerable time pursing claims against the perpetrator, Mr. Ortiz. Contrary to the Vandevelds' argument, Mr. Weeks and Mr. Poore see no value in focusing the case on sketchy claims and a judgment-proof defendant.

In stark contrast, when Mr. Weeks and Mr. Poore took over the case, they received the Court's permission to extend the discovery cut-off, propounded appropriate written discovery, took the necessary ten-plus depositions of the witnesses and defendants, retained experts and obtained expert reports at great expense, added new defendants and amended the Complaint, defeated summary judgment, spent over $74,000.00 in costs alone to successfully prosecute this matter, attended mediation sessions and settlement conferences, and positioned this case for reasonable settlement discussions. Defense counsel can corroborate that the "heavy lifting" in the case was performed by Mr. Weeks and Mr. Poore and that the Vandevelds' work did little to get the case is a posture to reach a settlement agreement.

Despite this disparity in the amount of work performed on this case, the Vandevelds are seeking over $119,000.00 in attorneys' fees and costs – which would amount to a full contingency fee of almost 30 percent of the $400,000.00 settlement achieved by Mr. Weeks and Mr. Poore. This amount is more in attorneys' fees that Mr. Weeks and Mr. Poore will obtain in this case. Mr. Weeks and Mr. Poore are only seeking approximately $101,000.00 in attorneys' fees and approximately $74,000.00 in costs so that Jessica can obtain a recovery of $225,000.00. Given the amount of work that the Vandevelds did (or failed to do) in this case, Jessica's recovery should not be further impaired by such an eye-opening lien. Since the Vandevelds have failed to show that their work contributed in some measurable fashion towards Jessica's recovery, their claim for *quantum meruit* must be denied.

## II. **CONCLUSION**

Based upon the foregoing, plaintiff respectfully requests that the Court grant this motion and strike the attorney lien and demand for fees asserted by the Vandevelds.

Dated: April 26, 2010                                KAHN BROWN & POORE LLP


By: s/ David M. Poore
David M. Poore
Attorneys for Plaintiff

-13-
PLAINTIFF'S REPLY BRIEF RE MOTION TO STRIKE ATTORNEY LIEN(S) OF AMY AND TOM VANDEVELD, ATTORNEYS-AT-LAW
SCHROEDER V. S.D.U.S.D, ET. AL.                                CASE NO. **3:07-cv-01266 IEG-RBB**